Hear ye, hear ye, hear ye. The United States Court of Appeals for the 11th Circuit is now open according to law. God save the United States and this honorable court. We're ready now for argument in McWhorter v. Commissioner and we will hear first from Mr. Rosenberg on behalf of the petition. Thank you. Good afternoon and may it please the court. My name is Benjamin Rosenberg. I represent the petitioner Casey McWhorter. Mr. McWhorter was convicted in March 1994 of murder and sentenced to death. On his jury sat Ms. Linda Burns, whose own father had been killed. She had been asked in a juror questionnaire whether any member of her family had been a victim of a crime. She had not revealed that her father was a crime victim. The clear and convincing evidence deduced in the state collateral proceedings showed that Ms. Burns had been intentionally dishonest in failing to disclose that her father was a crime victim. Had she been honest in her responses to the juror questionnaire, it would have been grounds to strike her for cause. Accordingly, the Richard issue and Mr. McWhorter should be either retried or released from custody. Even if Mr. McWhorter had had a fair trial... Mr. Rosenberg, this is Judge Wilson. What do we do with her testimony at the Rule 32 hearing when she was asked if she believed that her father was murdered and she said no, and that she also said at the Rule 32 hearing that her decision as a juror was based on the evidence? And so given the deference that we owe to the state court's factual determinations, tell me how are we going to get around that? The answer, Your Honor, is that twofold. First, she gave multiple answers at the Rule 32 hearing. She stated that she always thought her father had been killed. She stated that she, and that's at document 13 at page 61. She stated that after hearing everything that she heard about the and she stated, and that's at page 65, and then she stated, I just always thought that my father was killed. And that's a page... Counsel, she also said that she didn't believe he had been murdered. At the time of the trial, she went back and forth. I think you say in the brief quite accurately, her testimony was equivocal when we leave it up to the prior fact to make the determination. But let me ask you more of the point about she gave different reasons or justifications she may have viewed it as for not answering the question in the affirmative. And one was that she interpreted the question as meaning whether he had been arrested or convicted and thought that because he hadn't been arrested or convicted, that was not a reason to put the fact down. And she never equivocated about that and said, I understood the question. There's corroborating evidence in the sense that she was the slowest one of all the jury venari to finish the survey, so much so that others had left the courtroom and court employees had to help her finish it. And also, it seems to me almost irrefutable evidence that she didn't interpret the question correctly. She wrote on there in the affirmative that her brother-in-law had been a victim of crime, drugs. And it's undisputed that he was arrested for drugs. He wrote on probation for a nephew or something. So it seems self-evident that she didn't interpret the question correctly at the time. Her testimony is to the same effect. And you have to have that she knowingly and intentionally was dishonest or provided a false answer, knowing it was false. So how do you get around the fact that she wasn't equivocal about how she interpreted the question and her own written evidence at the moment she was answering the whether any member of her family had been a victim of a crime and then asked, was anyone ever arrested for the crime? So I think it would have been clear to anyone reading the question that it was not written necessary that there be an arrest or conviction. I understand that, but we can't use the objective evidence interpretation of the question. The standard requires us to get inside her mind the evidence we have. And if it would have been clear, if it was clear to her that victim of the crime meant victim, then why did she answer in writing the question the way she did? The only answer that I believe is consistent with the hide the fact that she had a victim in her family who was a murder victim. The evidence that we would respectfully submit. I'm sorry. I know. I understand that. I'm just not sure that a finding that she misinterpreted the question didn't understand that she was a high school dropout and was having trouble with all the which is one of the court employees at Apple. I'm not sure it's an unreasonable determination of fact of the state courts to rule that she didn't intentionally mislead anyone in her answer. Your Honor, I understand the court's question and the court's point. I would just note that being slow to fill out the questionnaire, there was no suggestion actually that she had trouble doing it. It's a sign of care as well as anything else. There's no testimony about what, if any, help she needed. That's quite correct. She left high school in 10th grade. However, she also had a job. She was a billing clerk at a rail services company. Her family subscribed to three newspapers. There was no suggestion when she was testifying that she had trouble understanding straightforward English language terms. We would respectfully submit that the evidence, including her very powerful feelings about her father's murder as evidenced by her testimony, but most especially by Ms. Stonecipher's testimony, is simply inconsistent with the notion that she didn't understand what a crime victim was or that her father was a crime victim, a crime victim we'd submit. Let me test your hypothesis, which quite frankly I hadn't thought of. If she put the brother-in-law down there, drugs, and the nephew, but whatever, as part of a deception plot, her grand strategy to get on the jury so she could vet her animosity towards murderers, why not just leave it blank or put no there instead of putting brother-in-law in there, which would invoke further questions as they did invoke further questions? How does your theory make sense? I understand your honest question, and I can't say why she wrote the brother-in-law and introduced that evidence rather than no evidence and said nothing, or simply said no, but I would submit that in light of everything else that she said, and that we know she thought at the time of the trial, and in light of the straightforward question of what a crime victim is, not a complicated term, that the clear and convincing evidence leads to the inference, not that she was confused, but she was deceptive. As I said, as we said earlier, and I think the court alluded to the point, she gave several different answers at the Rule 32 hearing for why she wrote down why she did not kill her father. She never testified that she was confused by the question. She testified variously that she wasn't thinking of her father, or that she felt because he drowned, he wasn't a crime victim, or because no one had been convicted or arrested, that there was no crime victim. The very variability of her answers there, and the fact that she never said, oh, I was confused, I think demonstrates that she intended to lie at the time of the voir dire, and that she continued to do so at the Rule 32 hearing. We would submit further, I'm sorry. I wasn't sure if there was another question. I didn't mean to interrupt anyone. Go ahead, Mr. Rosenberg. I don't hear any other questions. How about the ineffective assistance of counsel claim, Mr. Rosenberg? Very well. To prevail on this ineffective assistance of counsel claim, Mr. McWhorter showed that his counsel did an inadequate investigation with respect to the penalty phase of the trial, and that he was prejudiced by the counsel's deficiency. The state court found that neither requirement was satisfied. We submit that even given the doubly deferential standard that this court and the Supreme Court have applied to these claims, it's clear that Mr. McWhorter's counsel conducted an inadequate investigation. There's no question that this case was an open, or virtually an open and shut liability case. The testimony supports that, counsel supports that proposition. Mr. McWhorter had admitted to shooting several shots into the body of the victim. He admitted it was in connection with the robbery. There was testimony from an uncharged person who was involved, and there were quite graphic photographs and videos of the crime scene. The prevailing standards at that time, time of the trial, required counsel to do a thorough investigation to Mr. McWhorter's background and his childhood. The standards called for counsel to discover all reasonably available mitigating evidence, and of course, those are the ADA standards to which this court has referred several times, repeatedly as has the Supreme Court. Counsel here did not do that. Counsel here did virtually nothing. There was a triple interview. It took place with three witnesses at one time. It was only 11 days before the trial, and that was very similar to the technique of practice. Counsel, may I ask Judge Collins a question about that? There was passing reference, I think, in either one of the opinions or orders, or maybe the state's brief, that counsel had talked to two or more women, relatives who testified at trial about the defendant over a period of considerable time before the triple interview. Is that correct, whether it was about guilt stage, sin stage, whatever? Had they had previous conversations before the triple interview with those witnesses? I believe that there's evidence. I cannot cite it. I do not recall precisely the page where there had been some communication between counsel and at least some of them. I do not know whether, for example, Mr. McWhorter's half-sister had been included in the earlier conversation. I believe, however, that his aunt or perhaps aunt, his mother, had spoken with counsel. Well, let me ask you this. You get more focused on my question, so I won't waste any of your time. Paul, those women weren't, in any shape, form, or fashion, eyewitnesses to the crime or fact witnesses to the crime, so any conversation these attorneys had to have had with these women had to have been about the defendant generally. Would it not, Paula? Your Honor, I would think, respectfully, Your Honor, I would say no. There could have been any number of questions or discussions the women may have wanted to have about what the chances were for Mr. McWhorter, what his outlook appeared to be, what the legal system, how that would work, when his trial would be, things of that nature. All right. Let me guide you on things that were concerning me about your brief, which I thought were very good. The neuropsychologist counsel hired before the trial, they put in their motion that they needed funds to hire him because it would be vital to the penalty phase, his examination, evaluation, and his testimony, quote, would be of extreme importance in the penalty phase, end of quote. Then the state says, and I have not read his report, but the state says in its brief that the neuropsychologist found no evidence of psychological distress, no evidence of mental disorder or disease, no evidence of brain damage, and no evidence of psychopathy. Now, two questions. Number one, is that a correct evaluation of what he didn't find evidence of, whether he was looking for the guilt stage and sense stage? And number two, did the neuropsychologist who was hired for Rule 32 purposes find any evidence of those things? The neuropsychologist did not find evidence of those matters that you, Your Honor, listed. The neuropsychologist, however, was not asked to do so. I would refer the court to his own report dated March 22, 1932. Now, are we talking about the trial or the Rule 32? Forgive me, Your Honor. I'm talking about the neuropsychologist at the time who was retained by defense counsel, who stated quite clearly the review of these materials, after describing materials, and I'm reading, Your Honor, from the supplemental appendix document 10, the review of these materials was for the purpose of rendering an opinion as to whether there was clinical support for a diminished capacity argument and or evidence that Mr. McWhorter was under substantial influence of another at the time of the crime for which the patient has been charged. Well, wouldn't those four things, every single one of them, go into a diminished capacity or substantial influence, subject to influence evaluation? Your Honor, I believe they might, but I guess without knowing more details of what any finding was, I couldn't say for sure, but I understand the court's opinion that they might indeed. But there was absolutely no, it does not appear, and Mr. Woodcock's testimony is consistent with that, that he was only asked to look to those two, on those two matters, both of which relate not to the penalty, but to the defense at trial, the defense of diminished capacity or insanity. All right, one more question, and I'll quit bothering you so much, and that is, did the neuropsychologist who was retained for Rule 32 purposes, including showing that the trial counsel did not do the job effectively, did he find any of those four things, distress, disorder, disease, brain damage, psychopathy? He did not, and I believe he testified that he could not, because doing an evaluation as late as he came into the process, that is many years later, would not have any validity. He only reviewed earlier materials. He did not interview Mr. McWhorter, would do any additional tests on him. Thank you. It is clear that, I'm sorry, once again, did I interrupt the member of the court? I'm sorry. Well, I think when it's the state's turn to argue on the ineffective assistance of counsel claim, counsel is going to say that this mitigation evidence that McWhorter's counsel failed to come up with was inconsistent with his strategy, both his trial strategy and his penalty-based strategy. More importantly, that he was just a good kid who fell in with the wrong crowd, and so how are we going to get around that? Because, first of all, there were several witnesses who would have testified that were absolutely not inconsistent, but were perfectly consistent with that strategy. For example, Ms. Amy Battle, who testified, who was his close friend and schoolmate, who said that he was funny and outgoing. She took a bus with him every day for an hour and stepchildren. They talked about how protective he was of his sister and how she never observed him to be violent or threatening. She further would have testified that even after he was in jail, and he would write letters to her and she to him prior to the trial, in which he would support her in various of the difficult things facing her life. That shows he was a good kid. It also shows she felt that the act of violence which he was trying was completely out of character. Similarly, his teachers, Frank Baker and Ken Burns, testified that Mr. Baker was his basketball coach. He testified that Casey was a hard worker, a team player. He wanted other people to like him. He participated because he wanted to be part of something, and he didn't skip practice, and he didn't fight. Similarly, Mr. Burns would talk about what a diligent student Casey was, a hard worker, and how mischievous, but not a disciplinary problem. The testimony of the witnesses who would have said admirable things about Casey would have been perfectly consistent with counsel's good boy, gone-crowd strategy. They would have given some meat on the bones and some context to the strategy. Of course, what in fact happened was counsel put on a completely nuggatory case. It was 26 pages of testimony, including from a former employer who barely remembered the case in the court. It was so generic and perfunctory a presentation that none of the witnesses was even mentioned to the jury in the defense counsel's closing argument. What they said could have been said about any teenage boy across America, and the jury didn't know Casey McWhorter in any way, shape, or form. This court has said that the question of prejudice depends on whether the newly found mitigation evidence paints a vastly different picture of the petitioner's background than that created by the actual penalty phase testimony. With due other than the act of that horrific night, which the prosecution did go into in detail in the penalty phase. The primary purpose of the penalty phase is to ensure that the sentence is individualized by focusing on the particularized characteristics of the defendant. That's what DeBruce said. The jury was not presented with any particularized characteristics of Casey at the penalty phase. It had no reason to believe, therefore, for example, that he could have been rehabilitated. The witnesses that Mr. Burns, Mr. Baker, Ms. Battle, Ms. Tiffany Hopper, all of whom knew Casey and liked Casey and communicated with Casey would have been able to give some indication to the jury, would have given some particulars of the person that actually were not done by counsel. The fact is, as this court said of counsel Williams, counsel uncovered nothing in their limited inquiry to suggest that further investigation would have been fruitless. And acquiring additional mitigating evidence. I'm sorry? Forgive me. I apologize. Counsel uncovered acquiring additional mitigating evidence would have been consistent with the penalty phase strategy that counsel ultimately adopted. That's true here. Here there was, as I said, a complete failure of investigation. The consequence of which was without strategic reason to cancel, to stop the investigation. Investigation, it's apparent that the counsel's failure to expand their investigation resulted from inattention, not from a strategic judgment, which is exactly what the court found in Williams v. Allen. Because that was so, the penalty presentation was completely ineffectual. It didn't do what this court had said is required to be done. And for that reason, the court cannot have confidence in the outcome of that sentence in penalty phase. Um, you know, I think that I don't, I can't quite tell how much time I have, but I expect it's very little, just a few seconds. And, um, yeah. Well, we'll add a minute to your reply time, Mr. Rosenberg. Thank you, Your Honor. Next up for the appellee is Ms. Curtis. Good afternoon, and may it please the court. My name is Kelsey Curtis, and I represent the state of Alabama. Turning first to the impartial jury claim, to succeed under the clearly established federal law at the time of the state court, my friend would have to show first that Gerber intentionally withheld information about her father's death during blood years. And second, that had he known that information, he would have successfully challenged her for cause. State court reasonably found that my friend had failed to meet his burden on both of those prongs. As to the first prong, the state court's determination. The court found that Gerber testified confidently and certainly that she had not deliberately withheld information and that she had tried her best to be honest throughout blood years. Such a credibility determination is entitled to substantial deference, even on direct review and even more. Ms. Curtis, this is Debra Martin. I wanted to ask you about the Alabama Court of Criminal Appeals ruling on this issue. It looks like to me that rather than examining juror bias, as I understand the Supreme Court precedent to require, they did kind of a prejudice analysis of how was Mr. McWhorter prejudiced by her participation on the jury. Isn't that a problem for you? No, Your Honor. First of all, petitioner was required to meet both prongs, so intentional and this challenge for cause or actual bias standard. As to your question, the challenge for cause standard, McDonough and Ervin are the cases that clearly established Supreme Court precedent speaking to that point. They say that you would have to show impartiality, that the impartiality of the juror had been affected. They defined that as you must show that that the juror could not or had not based their verdict solely on the evidence presented at trial. The Alabama Court of Criminal Appeals specifically found that Juror Burns had based her verdict on the testimony and evidence submitted at trial and on the court's instructions and also found that the event surrounding her father's death had no bearing on her verdict. While they do use the word prejudice because the defense asked them to use the state law standard that uses the term prejudice, the actual finding comports completely with that federal standard set out in McDonough and Ervin. But it is clear, isn't it, that had McWhorter's counsel at the trial known during voir dire that Juror Burns' father potentially was murdered, they would have struck her with a peremptory challenge or at the very least challenged her for cause. Didn't they testify to that at the Rule 32 hearing? Yes, Your Honor, as to they testified to that. No, as to that's enough under clearly established federal law to meet the second prong. Rivera, the Supreme Court case, says specifically that there's no constitutional right to preempt three challenges. They would have to show not only that they would have challenged her for cause, which just to clarify, the counsel testified that they probably would have challenged her for cause, never that they certainly would have. But even assuming that they would have challenged her for cause, the standard requires that they could have successfully challenged her for cause. And as we just talked about, that means showing that she would have decided the case based on evidence that wasn't presented at trial. Also, there's good evidence in the record that if she had been challenged for cause, she would not have been dismissed under the Alabama judge's decisions at the time. There was another juror whose nephew had been killed in a convenience store robbery the Sunday before Wadeer started. And the court specifically found, they asked if he could be impartial. He said yes. And the court specifically found that his nephew being killed in a robbery at a convenience store was, quote, not grounds for cause, close quotation. So I think that there's ample evidence in the record that there would not have been a successful challenge for cause. And so the state court did not violate any clearly established federal law when it found as much. What's our standard, though? It's whether there's a reasonable probability that there would have been a different result. In other words, the juror would have been excused for cause. That's the standard that we're bound by, though, isn't it? Under McDonough, the standard is that there would have been a successful challenge for cause. And then the court goes on to say that what that means, that the court must ignore any error that did not affect the fairness of trial. And that's why they have the second step. And they say that only if the juror was partial, only if the defendant has shown that their impartiality was affected, would that affect the fairness of trial. And so that's the standard set out in McDonough and Irvin. Is that McDonough versus Greenwood? Yes, Your Honor. I believe so. That's not a murder case, though, is it? That's a civil case, isn't it? It is a civil case, Your Honor. But it's the clearly established Supreme Court law as to juror impartiality and bias. And my friend agrees that that is the relevant case here. That is the case that set out the clearly established federal law that bounds the state court at this time. So just very quickly, turning back to whether the juror was in Juror Burns intentionally lying, because as I mentioned, both of these prongs must be met and neither has been. The credibility is given a lot of deference under AEDSA. And juror impartiality determinations are given an even another gloss of deference because the Supreme Court has said jurors are testifying or answering questions they're unfamiliar with, they're nervous. And so demeanor is crucial to findings about juror impartiality. And not only in whether or not the court believes the juror, but also just that demeanor plays a fundamental role in simply understanding what the potential juror is saying. And so demeanor inflection, the flow of questions and answers can make confused and conflicting utterances comprehensible in a way that you can't see on the record. And so both of the prongs were based on reasonable credibility determinations by the state court, and neither of them, and the challenge for cause standard was not contrary to the Supreme Court standard. Unless there are any further questions on the impartial jury claim, I'll go ahead and turn to the ineffective assistance of counsel claim. Let me ask you this counsel on the ineffective assistance counsel claim, is the youthful offender investigation by the probation office in the record? Yes, your honor. And is it undisputed or clear from the record that trial counsel had access to that in advance of well in advance of the sentence stage? Yes, your honor. Go ahead. There was a youthful offender status hearing. There was two of them, one in which the court commissioned the report or told the probation officer to go and do a background investigation and meet with Mr. McWhorter. And then a second one after that report had been compiled and given to the defendant in which the defendant testified or Mr. McWhorter, he testified that one, he had gone over that report with his attorney at length and two, that everything in that report was correct. So while we don't know the content of most of the attorney client conversations, we do know that Mr. McWhorter and his counsel not only went over this report, but that Mr. McWhorter testified that everything in it was correct. This may not be relevant to our decision, but the two co-defendants, they were both minors. Do you know what their, and they both pled guilty. Do you know what their sentences were? I do not know what their exact sentences were. I do know that neither got the death penalty, but I'm not sure if they got life or life without parole. They couldn't get the death penalty. Right. Or at least couldn't now, couldn't have since Stanford. Well, I'm not sure what they got, but they did not get the same penalty as Mr. McWhorter. And he just made it by three months, correct? Yes, he had turned 18 three months prior. The court did do a youthful offender status hearing and determined that he should be tried as an adult. And so going back to the performance song, which is what we're discussing now, and if we're starting with youthful offender investigation, this was received eight to nine months before the trial in June or July of 1993. And it included the juvenile record, personal and social history, which talks about drug use, mental health, education, employment history. It also has family history, and it talks specifically about the reputation in the community. And on that point, it found, quote, the probation officer said this, people that I talked to were surprised the case would be involved in this situation. People I spoke felt that the people he was running around with were his main source of problem. And so that supports the trial counsel's strategy decision. But just to go over the other information they had, they had spoken to the mother, the sister, the aunt McWhorter. They spoke multiple times to the probation officer that was on February 24th, 1993, which is over a year before the trial. He also had another interview with just the aunt on March 23rd of 1993, and then spoke to the mother again on January 24th of 1994. And then these are only the discussions that attorney Mitchell documented. So we're not sure exactly when or how often attorney Berry talked to them, but he did testify at the Rule 32 hearing that he had had at least two conversations with at least the mother and aunt prior to the trial. Do we know what the subject matter of the conversation were? Two of them, there is a notation. No, as to the conversations for attorney Berry. As to the conversations for attorney Mitchell, one of them says the notation is reply evidence, I'm not sure exactly how to interpret that. One was about the preparation for the bail hearing, and the other has no notation, that's just the aunt. And so we're uncertain about that, but when the record is there, we presume that they were talking about where they should have been. Also, they met, just attorney Mitchell met with the client at least six times, the first one being February 22nd, 1993. And we do know, while we don't know the exact content of the conversation, we do know that they discussed all the general backgrounds that could be helpful. Also on July 1993, which is about seven months before the trial, they subpoenaed the medical records from the suicide attempt. And my friend says in his opening brief at 2 and 18, that that was in preparation for the penalty phase. So that's at least seven months before they are already taking steps for the penalty phase. He also, the attorneys also met with McWhorter for at least an hour and a half to discuss those medical records. And there was a urine test that said there was no drugs in the system at that point, and that he had no evidence of seizures. And then turning to the Dr. Robbins, the neuropsychologist report. So just to clarify, what my friend said on the other side was that it was to assess diminished capacity or substantial influence of another. And those are only relevant in the mitigation phase or the penalty phase under Alabama law. Under Alabama law, you're not allowed to submit evidence of diminished capacity in the guilt phase unless it rises to the level of insanity. And then it's not called diminished capacity. So it's clear from even the fact that he was asked to look at diminished capacity and substantial influence of another, that he was specifically commissioned to look at the two statutory mitigating factors. Moreover, in the record, in the March 11th hearing on the pretrial motions, the court asked why they need money for additional evaluation. So they had originally hired him in October of 1993, and he did about a day's worth of tests and a clinical interview. Then counsel reached back out to him at the beginning of March and asked him to do a second evaluation, if he would be willing to do a second evaluation. He said yes, but he'd need more life background information. That's why they did the triple interview. It was in response to Dr. Robbins asking for additional life background information. Then they asked the court for additional funds for a second evaluation, specifically for mitigating evidence. In the March 11th trial transcript, they make it very clear. It says specifically that, judge, I don't know if you'll testify or not. The situation is I have some additional information I would like to send to Dr. Robbins to review. See if he thinks it would be significant in light of his past examination in the event that he is called upon to testify at the penalty phase of this case in the event that the defendant is found guilty. And so it's very clear that he was hired and asked to evaluate specifically with regard to the penalty phase. On March 16th, he had a two and a half hour conference call with attorney Mitchell about the results of that evaluation, specifically about the mitigating evidence. And it's important to know that at that time he had evidence or had information that Mr. McWhorter had been in a car wreck, but he had not been admitted to the hospital. He had information that he had puffed gasoline and paint. And so, and he came to the conclusion, the conclusions that you said, which were that there was no brain damage. And that is not specifically in his report, but he did testify to that at the Rule 32 hearing, that there was no brain damage. And the counsel testified that he had asked about it. He knew that from the conversations on the phone. And in his report, he finds that there's no support. There's no clinical support for the statutory mitigating factors and that there's no evidence of psychological school distress or confounding mental disorder. So in light of all of that information, the attorneys made a strategy decision and they chose to go with this idea that he was influenced by the wrong crowd, that he had grown up being a good kid and that they specifically wanted to play on the sympathy of the family. And this court found that playing on the sympathy of the family is reasonable. Of course, much of this mitigation, evidence that was not used, would actually corroborate the trial strategy. He was a good kid who fell in with the wrong crowd. It seems like counsel could have used a lot of this testimony and they failed to use it. And that if it's available and it's not used, didn't that amount to ineffective assistance, especially in a case like this, where the jury obviously was conflicted during the penalty phase of the case to vote it, not to recommend the death penalty. It was a 10-2 vote and there was even an Allen charge, wasn't there? And all that together suggests that maybe there was ineffective assistance and he was prejudiced by the failure of counsel to include this collaborating evidence that would support his penalty phase strategy. So, Your Honor, a couple of responses to that. One, I don't think there was much in the evidence that they had before that would have been helpful to their strategy that they did not use. There was the two witnesses mentioned by my friend and the Rule 32, like the coach and the teacher, that would have been, would have comported with their strategy, but would have been cumulative as to the prejudice analysis. And as to the performance, they had ample evidence. They had almost all of the evidence that was at the Rule 32 hearing, at least in type, if not in quantity. And they made a reasonable strategy decision. And that strategy decision is virtually unassailable because of all the information they had before they made that decision. Mr. Curtis, let me ask you this, since you're arguing it was cumulative. I haven't read the record. Did the state contest that, let's call it the Okie strategy? He was a good old boy, but he fell in with a bad crowd. Did they try to show that he wasn't a good boy before that or that the other people who participated were in a bad crowd? What was the contest? What did the state do to contest that strategy, if anything? Nothing. They put on no evidence during the penalty phase or the sentencing phase. And their main argument in closing was about how egregious the crime was. And as we know, there is ample aggravating evidence in this case, which none of it was challenged by the additional evidence. That alone is not sufficient to overcome prejudice, but it is a factor to consider. And that was held in Porter. And so the state focused on those aggravating circumstances, like the planning and waiting in the house for three or four hours, the shooting 11 times and doing the kill shot in the head while he was on the floor, that his only remorse was that there wasn't more money and he retrieved the wallet off the dead body, that he was part of a gang and all these graphic pictures. And so the state did not try to contest that he had been a good kid. Or that this was the wrong crowd. And like I said before, a large part of the strategy was also playing on the sympathy of the family. And so I don't think that keeping out that additional evidence, that I don't think they kept out evidence that would have been helpful that they had. I don't think it was unreasonable not to investigate those leads farther. As they said, they talked to every single witness that the mother, aunt and sister mentioned. And they found, and that has been found sufficient to be effective performance. And so on the performance song, the state court was not unreasonable to find that these attorneys had not behaved ineffectively. And as the prejudice, we've already talked about it a little bit. We've mentioned that the evidence was cumulative, but also a lot of it was double edged, even for the strategy that my friends were going for. And for instance, the evidence of drug and alcohol abuse, the attorney said they wouldn't have even used it because without some lasting effect, the juries in Marshall County do not take kindly to that. You have his girlfriend testifying that they drink a lot and then that he cheated on her with his friend, which could have been harmful to him. There's no evidence of any brain damage. And also the testimony by his family could have backfired. You have the dad testifying that they went to the basketball games for him. He bought him two cars. They built a house. They've taken fishing. The mom, they sent him to an alternative school when he was skipping class to try to get him back on track. And it just is not the type of evidence that has supported an overturning of prejudice in the Supreme Court cases before. This is Judge Wilson. I think you could make a reasonable argument that during the penalty phase of a death case, there's no such thing as cumulative mitigating evidence. You're on trial facing the death penalty, and this is your last shot. You want to give it everything you've got. And there's a ton of cases out there that say that when there's available mitigating evidence and it isn't used during the penalty phase of a case, that could constitute ineffective assistance on the part of counsel representing someone who's facing the death penalty. Well, Your Honor, this court has held multiple times that when evidence is cumulative, that's not enough to overcome prejudice. And in fact, either this month or last month, this court in Knight said that even if there was testimony that filled out a previous, gave more detail about instances or facts that had been discussed at the penalty phase but didn't bring up anything fundamentally new, that wasn't enough to overcome prejudice. And so here, there's nothing fundamentally new. There's nothing about the testimony of the coach and the teacher that would have brought anything that the penalty phase jury or the sentencing judge had not already heard. And even if you want to say, well, they should have heard that, there's not a reasonable probability that hearing from the teacher and the coach that he had done well in school would have caused them to vote differently when they'd heard the same type of evidence from the mother and his employers, and that did not convince them. This is not a case where this court has what has found the evidence to be abuse and brain damage and or the missing a statutory mitigating factor or any of those things that would allow this court to overturn the prejudice decision. And the state court was reasonable, at the very least, was not unreasonable to find that Mr. McCorder was not prejudiced, even assuming that this year-long investigation was insufficient. Unless there are any further questions, the state asked this court to affirm the district court's dismissal of the habeas petition. I don't hear any. Thank you, counsel. Thank you. Mr. Rosenberg, six minutes. Thank you, Your Honor. Once again, for the record, Benjamin Rosenberg on behalf of Mr. McCorder. The notion that the additional evidence the counsel might have found would be cumulative is, I think, not well-founded. Any review of this record on a death penalty case after horrific crime with almost certain convictions will conclude that the 26 pages of testimony from witnesses, one of whom didn't really, it's very clear, even remember or know of the defendant, the other one whom had only a passing acquaintance and happened to be a courthouse employee, and then his mother and his aunt, no one could think that additional testimony would be cumulative. The testimony of Ms. Battle, whom I think counsel may have suggested was his girlfriend to whom he'd been unfaithful, that is not accurate. They were not romantically involved. But Ms. Battle was a friend who knew him extremely well, she testified, and to whom he had been kind, even in his moment of despair in jail. And then testimony from, excuse me, from the coaches who could say that with guidance and with structure, he had performed well. He had wanted to be part of the group. He had had redeeming and obviously likable and warm features. That's not cumulative. There's absolutely nothing in the record before the jury that would have led them to know those things or to understand those things. The only thing the jury knew when they went in to decide his fate, the only facts they knew about him were the horrific crime and that he had taken part of on that one night. And that's what the prosecution summed up on. The court asked, did the state contest the so-called OPI defense? The state made no mention, no mention of the witnesses, nor did it have to. Not only did the state make no mention of the witnesses, the defense itself made virtually no mention of any of the witnesses. All it said was, you've heard four witnesses take the stand to talk about the knowledge of this young man, all very poignant. It's touching. Counsel, let me ask you this. What was the name of the girlfriend who the Rule 32 attorney said they should have called? Tiffany Long. Yes, there were two young women, Ms. Battle, about whom I was speaking. And then there's also Tiffany Long, who also testified about the Rule 32 hearing. And she too had kept in touch with Mr. Porter in the, even after he committed his crime and when he was in jail. And obviously she continued to feel a closeness to him. And there was, in fact, the fact that they had broken up shortly before the crime, which might have, in fact, helped to explain his depression, among other factors not brought to the jury's attention. Well, of course, the other side of the sword on that was when she gave the time that she had known him and they'd been going together as from one month and one year to November 29, a particular year. And the counsel asked one question to me and said, how do you know that specific date? And she said, because that's when I caught him cheating with my best friend. You can understand that defense counsel might not want to present it to her to explain what a good guy he was. I understand the strategic choice on that. Had they known about it, I would understand and it would have been a reasonable strategic choice. But that's certainly not the case of the zany battle. There's no such testimony. She testified somewhat charmingly that, the question was, were you romantically involved? And she testified, no, but I think he had a crush on me and it was somewhat affecting. But the fact of the matter is, counsel didn't know about any of this and it's not the case. The state, my colleagues suggested that we talk. Do we know, this is Judge Wilson, do we know from the record how old McWhorter was when he had this interaction with his girlfriend, his girlfriend's best friend? Yes, it was in November of 1992. So he was 17 years old. I didn't hear you. 17. Yes, Your Honor. Forgive me. Counsel suggested that my colleague suggested that counsel had spoken with everyone that they'd been told about. That's not so. Because they didn't have time. In the triple interview, the notes show that one of the interviewees told counsel all of his friend's parents think that he was the most polite person. His friend's parents bragged on how well-behaved he was. That's in document 14. They didn't go and talk to any of the friend's parents. We know that because they didn't ever say they did. They never went back and talked to Casey about who were those people? Who should we talk to? They never, of course, as we point out in our brief, they never went back and spoke with Casey after the triple interview. Notwithstanding that there, they could have learned names of high school teachers, friends, colleagues, et cetera. And the reason they did was they said it was not because of a strategic decision. It was because of complete disinterest. Most of his friends were charged with murder, said Mr. Berry. That's absolutely not the case. So questions, why didn't you- Go ahead and finish that. Thank you, your honor. And in the end, this young man was sentenced to death because his lawyers did not do an adequate investigation. They didn't put on the information that anyone would have given to show what kind of person he was. And therefore the jury did not have what this court has said they must have, an individualized picture of this individual. And for that reason, we asked for it to be issued. Thank you, counsel. Speaking only for myself, I thought the briefs on both sides were very helpful and I appreciate that. And I don't say that often. And we will take that. I thought they were good too. Thank you. I thought they were outstanding, but if this case goes any farther, make sure you include Wiggins versus Smith in your table of authorities. It was on a notice book and our table of authorities left something to be desired. And I apologize for that. I have learned a long time ago not to rely on the table of authorities. I'm not sure if that gets assigned to the assistant or whatnot, but notwithstanding that, when you got past the table of authorities, they were good briefs. We appreciate that. It's very helpful. And we'll take that case under submission and stand in adjourned as far as this phone call is concerned. Thank you. Thank you. Thank you.